States No. 26-5006 tend to protect their rights-at-all v. internal residue service-at-all time. Mr. Christensen for the appellants. And Ms. Zimmerman for the attorneys. Good morning. Thank you. Jacob Christensen for the federal appellants, and I would like to reserve two minutes for a bow. May it please the Court, this Court recently held in Centro that IRS is obligated to the disclosed taxpayer address information to ICE upon receipt of a valid request. And this Court upheld IRS's policy of sharing address information with ICE, which is reflected in a memorandum of understanding between those agencies, holding that the address-sharing policy was unreviewable under the Administrative Procedures Act. Yet the District Court in this case has wrongly enjoined IRS from implementing its address-sharing policy based on the Court's conclusion that IRS has adopted some other address-sharing policy that allegedly exists separate and apart from the memorandum of understanding at issue in Centro. No such separate policy exists, and the District Court lacked authority to enter the preliminary injunction here because plaintiffs lack Article III standing, because they have not challenged the final agency action under the APA, and as this Court already held in Centro, with respect to the memorandum of understanding, and because plaintiffs have not otherwise demonstrated that an injunction is warranted. If I may... Can I just... Yes. He said that, you know, which I can address, and this Court can consider the Romo Declaration as part of this appeal. All right. If plaintiffs wish to discuss the Romo Declaration in their appellate brief, they are free to do so. I assume that means that we're allowed to read it. Your Honor, I think the Court is allowed to read it. I don't think that it properly figures into this, or should figure into the Court's decision, because it was... Well, that's a different... I just want to understand here. You said they're free to brief it, which means we're free to read it. Otherwise, I would expect the government to say otherwise. There's no argument that we couldn't do that. We could take judicial notice of it, because it was filed with us in the O. Centro case. It's filed with the District Court in this case. I agree with that, Your Honor, but it was not part of the record before the District Court at the time the injunction was issued. So technically, it's not on the record, on review of the preliminary injunction at issue. So we can supplement the record under FRAP 10E2, and given that the government has had no objection to its use in this proceeding as consideration by us, is that... There is also, as you know, a notion about an indicative ruling where we have to remand for the District Court to make it part of the record, or do we... Can we just make it part of the record ourselves under 10E2? The government wouldn't have an objection to making it part of the record, Your Honor. We don't think that the ROMO Declaration changes the outcome in this case, as we've explained in our opposition to the remand and in our briefing. The ROMO Declaration reflects an error in the way the IRS's address sharing policy was implemented. It essentially describes the DHS ICE data exchange program, which is in the record, starts at JA 462, written document. It's an exchange process established, presumably, to implement the MOU. So this is sort of... We had a facial challenge to the MOU in El Centro, and now we got, as applied, what is the government doing? And that's what the data exchange program tells us. And that tells us, you are not complying with the law. You are not complying with requirements of the statute. ROMO Declaration says that's right. The government says, well, we weren't doing that. But we've got a document here. Your Honor... The government's explaining, implementing the MOU... If I may... I'm just going to finish the setup here. Clearly in violation of the statutory requirements. That happens to be, I think the district court used other words, but exactly what the district court was saying is the problem here. This is the as-applied problem, and the problem is in writing and documented. If I may, Your Honor, that's right. What this was was an error in the implementation of the IRS's address sharing policy. The plaintiffs in this case do not challenge the August 2025 disclosure by IRS. For reasons of their own, they have not challenged the implementation in August 2025. Their argument in this case is that IRS has adopted some address sharing policy, apart from the memorandum of understanding that they argue is unlawful. That's what this is. Reflects how IRS implemented its address sharing policy. That's what it is. That's my aspect of this, yes. But that's not what they're challenging. They're not challenging the way... Excuse me, pardon me. I mean, they'll tell me if this is not... I mean, this is documentation of the very... We'll call it a policy, a program that should challenge you. This is Exhibit A. This is it. Here it is. Don't tell us this policy doesn't exist. Here it is. I would disagree, Your Honor. The policy is reflected in the memorandum of understanding, which this court recognized in... You just said there has to be as applied. And I mean, can we agree that this data exchange program does not comply with 6103? I would agree that the implementation in August 2025... No, no. That's not the question I asked you. I'm asking you... I'd like to hear the answer. Implementation in August, which is not challenged here, was in violation. The ROMA Declaration says there were disclosures made where ICE had not submitted addresses. Yes, with respect to a small percentage of the individuals whose information was... So that implementation, and your point is, yes, conceitedly unlawful. Right. But not... Okay, go ahead. Right. But again, plaintiffs are challenging that implementation. Do you agree this is unlawful? I agree that the way that it was implemented did not comply with the statute because... Okay, let's try this. But the policy, IRS's policy... Let's try this in smaller steps, okay? Did this data exchange program that's in the record here, was this in place in August? Yes, it was. And this is, in fact, was there were lots of emails in the record back and forth. This is how we're going to make this disclosure that occurred in August, correct? This is the way that they plan to implement... Lots of emails in the record. To implement the policy reflected in the memorandum of understanding. Back and forth with IRS and DHS and this, and then this is the product of it. And there was lots of discussion about this. I don't know that there was discussion about this specific overview document in the appendix at page 462. This is the DHS ICE data exchange overview. Yeah, I think this was internally created by IRS to implement its policy that's reflected in the MOU. And again... No, no, no, no. This is the IRS policy that was used in August. We don't know if it was used otherwise, but it was used, resulted in the turning over of information in August. It was the way that the policy was implemented. It was the process for implementing the policy. And I'll say step after step after step does not comply with 6103. So the policy that was adopted to implement the MOU does not, in fact, implement the MOU, unless we got it all wrong in Ocentro in thinking the MOU facially complied with the statute. Yeah, the IRS's policy is reflected in the MOU was to require a name and address.  I think that that may have been their policy at the time they were arguing that case to us. But that case was still pending here when the August release occurred. But more importantly, that case was still pending here when this data exchange overview was adopted by IRS. Okay. I told about this. I agree that in implementing its policy, IRS made a mistake. No. But the e-mails back. You wanted to say there is no policy. I'm looking at this program right here. Well, if you look at the entire record, you'll see e-mails back and forth between Treasury and IRS where Treasury officials insisted adamantly that any ICE request must include a name and address. And that, excuse me, that's consistent with what was in the memorandum of understanding. An address. What this tells us is address just means fill in the zip code box. And by the way, it doesn't have to be a real zip code. Just put five numbers in the zip code box. So now this is the rubber meets the road document. This is the implementation. This is the as applied challenge. Again, but Your Honor, they are not challenging the as applied disclosure in August 2025. They, their argument is that there's. As I understand it, is how you are implementing the MOU. And that's what the district court was very troubled by is what you're actually doing in practice. And it's in writing. Well, I would push back on that. IRS's policy has never been to respond to requests that did not include an address. The intent. Sorry. Sorry. Has always been to require the address. We don't have mind readers as part of this APA challenge here. So what we have is IRS saying in this document. All right. We're going to check and make sure. Sorry, did you need to get your. Okay. Sorry, if I made you drive. Is that for the address? All we need is. Something in the zip code box. And it just has to be flat numbers. So, Your Honor, it's an error. And presumably you're going to have the, I forget, we call it the EIN or the TIN, or whatever we're calling it. Do you have that number? Then we'll just go ahead and match it with that. It's an error in implementation. But in order to challenge this as a policy. The implementation. It's an error in the way the policy was implemented. And in order to challenge a policy, there must be, there's got to be a rule under the APA. And a rule is defined as an agency statement that is designed to implement or interpret or prescribe the policy or the law. Yes, and that's exactly what this is. Here's how we're going to implement. I mean, this is step by step one. Step one, IRS receives input file from DHS. Step two, preprocessing task. Make sure certain things are filled in. One of which doesn't have to be an address. As long as there's five numbers. Give me any five random numbers in the zip code box. Step three, find the last known address process. Step four, either SSN lookup or we're doing the, with SSN here being the TIN or DSN lookup block. If you got that and something in the zip code box, we're going to match it. We're going to give it to you. That doesn't comply with 6103. Step 3B, if you're only doing it on name and address. 3C. I mean, these are the steps by steps. This is, this is the implementation. This is how. And if you say this is an error because it's doing it unlawfully, we're agreeing. But this is the policy. This is the practice. This is the program for implementing the MOU. Well, and with respect, Your Honor, if any such policy would be directly contrary to the policy that has been adopted explicitly and signed by the heads of the agencies reflected in the memorandum of understanding. So, I disagree that there's some policy to, to. Is this a false document? This is a document that implements the policy imperfectly. I acknowledge, I acknowledge that. Unlawfully. With respect to the extent it doesn't require an address, it's an error in implementing the policy. Can I try? Your position in the Centro case, which was successful, was that the MOU wasn't a policy. Right? Was not, did you say? Was not a policy. Now, it wasn't final agency action. But it was, it was a policy, unbinding policy statement. But it was in final agency action. That's how you won. One of the grounds for how, how you won. Now you're saying, in this case, that this data exchange at Appendix 462, that that's not final agency action either. Correct. Because it can't override the memorandum of understanding? Is that why it's not final agency action? I just want to make sure I understand your theory, why this isn't final agency action. This document would not be final agency action for the same reason that the memorandum of understanding itself was not final agency action. It's because it's a non-binding policy statement, which has no actual legal effect or legal consequences on anyone. It simply reflects what IRS views, IRS's own views of what the law allows it to do in providing address information to ICE. As this court explained in Centro, you know, a policy statement that simply reflects the agency's views of what it is allowed to do under the law does not have binding legal effect on anybody. And in this case, that's all the more important because the information that's being shared is address information, which plaintiffs and their members, or the members of the plaintiffs in this case, were already required under federal law to provide to DHS. So even if this address sharing policy, well, that means that the address sharing policy Where is the, so you're not disputing that an action by an official to disclose addresses is a final agency action, right? That would be a more difficult question, but the plaintiffs have not challenged that. Just answer the question. We've not raised that argument, but they have also not challenged the actual implementation or the actual disclosure. I'd love you to answer the question. I don't care whether you've raised the argument. When an official says, we have a request, give them this information in response to the request, is that a final agency action? In general, I would agree that that would be, Your Honor. In this context, I would disagree. And the reason is there's no binding effect. There's no legal consequences from that action because the address information is already required under federal law to be provided. Aliens are already required to provide that information to DHS. So there's really two arguments in sort of in the MOU context, where one, it wasn't saying anything different from what the law required. And I mean, it was, and you say it was only guidance. I mean, it was binding, but it wasn't doing anything new binding. Well, this court said that it was a non-binding, non-final policy statement, as opposed to a binding rule. It was not a binding rule. So let me get at this a little bit differently. This process, whether it's as the process of responding to the August request was approved at a pretty high level. Assume that the injunction were lifted, the district court's injunction were lifted, and ICE came back with an identical request, with a new list, a new spreadsheet. Could a lower-level official approve the request based on the determinations reflected in the August decision? No, I think the lower-level official would be guided by the Memorandum of Understanding, which is what reflects IRS's policy, and by the statute, but not by the- So could a lower-level official look at it and refuse the request, saying, well, there isn't really a specific justification offered here? Certainly. I would think certainly, yes. They could. Is there any situation before where the IRS has accepted a single high-level request letter and spreadsheet like this as a justification adequate under Section 6103? I can only speculate. Medical requests. I don't know the answer, but what I can say is this is the first time IRS had implemented the policy reflected in the Memorandum of Understanding, and as we've said, it didn't do so perfectly. There were problems with its implementation, but it was the first time IRS had ever implemented that policy that's reflected in the Memorandum of Understanding, and the intent has always been to require a name and address, and that's pretty clear from the communications between the Treasury officials back and forth with ICE officials. So when you say a low-level official could make a determination that a submission saying the same kinds of things that was said here in the long letter was insufficiently specific, they wouldn't need some higher-level person to pass on that? I don't believe so, Your Honor. So how does it go within the IRS? Who ordinarily decides whether a request satisfies the requirements of 6103? I do not know the answer to that. I apologize. I'm not sure who has final decision-making authority here. What I can say is that the disclosure in August 2025 here was approved by the IRS Commissioner. I don't think that the requests are generally elevated that high, but I actually don't know the answer to that. I'd be happy to dig into it. Do you have any reason to think if a request of similar scale came in that it would not also go to the Commissioner? I think the request of this scale probably went to the Commissioner because of its size and the novelty of it. So that's a little bit in tension with your answer that if somebody got a similar request, a lower-level official, that they could deny it because it doesn't, in their view, it didn't give specificity or it didn't explain direct involvement in the law enforcement action as required by the... A lower-level official could say this isn't specific. Well, they wouldn't be bound by the previous disclosure. But they could decide it themselves. Right. It would be a new request that would need to be re-evaluated to decide, you know, whether it complied with the requirements set forth in the Memorandum of Understanding and the  But there wouldn't be any binding effect to the prior August 2025 disclosure. That's a data exchange overview. Isn't that the process for dealing with requests? I guess I disagree on that point. The data exchange overview was IRS's attempt to implement the policy reflected in the Memorandum of Understanding. Was this something that was... I hadn't read the record, but tell me if I'm wrong, that IRS and DHS had some background because the plan was that there were going to be requests that were large mass requests. How are we going to process these? And obviously, computer programming was undertaken. Yes. And that, as far as I'm aware, the record doesn't... No, Your Honor. Not that I'm... The record doesn't show that that is my understanding. Okay. So they didn't have any... Sorry, excuse me. They didn't have any idea what DHS was going to send over when they designed this? They didn't really talk to anybody at DHS about that? I would think you would want to know what information we're getting and what format before you design a computer program, a processing process. Forgive my redundancy. There was back and forth as to what information DHS needed to provide and specifically information that would comply with the statute. Yes. And the administrative record contains some of that communication. Yes. What's the minimum to comply with the statute? Minimum compliance is still compliance if it is actually, in fact, compliance. And then this... I mean, this wasn't an oops. It's our first one. We've got to work out some kinks, right? This is a formal program. Obviously, there's computer coding going on here. There's things that will be projected as errors or things required for processing, things that are not. All of this was very calculated. And I'm not aware that this document, Appendix 462, I'm not sure the record even shows us who reviewed it, who approved it, whether there was any sort of approval process. It just exists. It's a document that someone created in an effort to implement the policy reflected in the MOU. It's a pretty detailed process. And in fact, there's another document that's the... They do some checking, some quality control, method 466-67. So this is a pretty... This wasn't somebody just sitting in their cubicle on their own. This is computer programming, right? What has to be in, what's in, what's going to throw up an error, what's not. All this stuff here, it's multiple pages of programming and steps that are going to be taking, what information is required, right? This isn't just a, whoops, the computer did something wrong. Someone decided that when the statute says address, we think just having five digits in the zip code boxes and an EIN, TIN number. And then, by the way, those can be any old numbers. We didn't even program it to verify whether that was an actual zip code. Well, I think the thinking was is that that would serve as an accurate proxy. And obviously, we've learned that's not the case in hindsight, Tanner, but... I'm just asking that if something here was done within the agency, it looks like a very formalized process. I'm not... There are these architecture overviews of this. This was not, whoops, someone put some wrong information in the first time. And suddenly, hundreds, tens of thousands of addresses are disclosed. This is a very formalized process and document that was, the Roman Declaration tells us. It tells us this is what we used. I mean, I think we'd have to speculate a lot to really know... Well, you're the one... ...what process... I'll tell you something about counsel. Your client produced this document, right? Yes, Your Honor. It produced it in response to either the document request or the... I'm not sure exactly how the district court organized the hearing, but your client produced it because it was relevant, right? Yes, and it certainly is part of the... Don't come in here and tell us that you don't really know what significance this document has. If it didn't have any significance, then your client wouldn't have produced it. Well, what I'm trying to say, Your Honor, is I don't know what sort of review or vetting or who would have, or if there would have been approval of this... It obviously had adequate vetting because it was relied upon, and your client produced it to have a court consider it. I agree it was relied upon. I agree... You have a document that has different information that was vetted better that you can show us that's relevant. No, you're point taken, Your Honor. Point taken. I agree. I guess my response still would be, though, even taking this... Even if we were to assume that this document accurately reflects a policy of the IRS, again, for the same reasons the memorandum of understanding is not a final agency action, this document and the policy reflected therein also would not be a final agency action because aliens are already required to provide their address information to DHS. So tell me this. Is there a document anywhere that reflects the current policy of the Department of Treasury with respect to address sharing? Yes, and that would be the memorandum of understanding. That is the IRS's policy. So I'm trying to understand how you are defending this case, and I have some questions for the FLEs about how they're litigating this case because a lot of it doesn't make sense to me, but it seems to me that you're litigating this case kind of the way that the government litigates cases where maybe there's like, you know, allegation of police misconduct, a bad search or something, and there's a civil suit where you say, well, a police officer might have made a mistake in, you know, searching this residence, but the government isn't liable because they didn't follow their training. They didn't follow the policy. So we as a government aren't liable. Maybe the individual officer is liable for violating someone's rights because our policy is different and our training is different than what was implemented and executed by this one official. So it sounds like your defense here as to why there's like no final agency action is a little similar where you're saying, well, to the extent that there is a policy, it's in an MOU, and this document, A462, can't really counterman the MOU, and the MOU is consistent with the statute. And so the only kind of action that can be challenged is the particular implementation that may have been flawed, but they aren't challenging that. They're challenging a policy, but the policy either doesn't exist or to the extent that it exists, it's the MOU. Am I understanding your position correct? Yes, Your Honor. Like to the extent plaintiffs wanted to challenge the August 2025 disclosure, the government would readily admit that there were mistakes made, that some information was disclosed not in compliance with the statute, but that's not what's happening here. The plaintiffs are arguing that IRS has some broader policy to make disclosures even when an address is not provided. I think that what they're saying is that the policy is to do what you did. The MOU may say one thing, but, you know, the real policy is to do something broader than what the MOU says. We know that because that's what they did, and it was signed by the commissioner of the IRS, no less. I think that may hold sway if this had been something that had recurred time and time again. This happened once in August 25, 2025. IRS admits that there was error in implementing that. Who admits it? Did the commissioner admit it? No, the government, the Justice Department. Well, I guess all I'm saying is that the plaintiffs are saying that the agency maybe have written down one thing in the MOU, but the agency is really doing something else, and we can see that because of what they did, and there's no reason to believe that they're going to do anything differently in the future. So saying that, well, the Justice Department said in some papers that's not going to happen again doesn't really answer the question of whether the agency is going to do it again. When we think that the agency, there would be a declaration from someone in the agency saying, no, that wasn't right, and we're not going to do that anymore. Well, and I think that's the Romo Declaration. I think that's exactly what that is. So I agree. So if this were to ever happen again, you're saying then that a district court would have a basis to hold someone in contempt for essentially acting in accordance with a declaration that was filed with the court to get a court to either vacate an injunction or to reverse an injunction? Yes, Your Honor. I think the district court in that situation, there are consequences for failing to comply with Section 6103, and a district court could bring those to bear in a case of a wrongful disclosure. I think that's correct. Can you tell me, Mr. Christensen, what role does ICE play in investigating or prosecuting criminal violations of 1253A? I know it has civil enforcement authority. Does it have a role in criminal enforcement of AUSC 1253A? Yes, ICE has criminal enforcement authority, as we've explained in our opening brief on page 6. AUSC 1103A authorizes the Secretary of DHS or charges her with enforcement of the nation's immigration laws. Then ICE officers are immigration officers under AUSC 1101A-18 and under applicable regulations, and they're empowered with law enforcement authority as set forth in AUSC 1357, which includes the authority to arrest aliens in violation of Section 1253A. And that's in our brief. So it's just the arresting. That's the role they play? Well, arrest and investigate as well violations and enforce the statute. Do they make referrals to or they do the whole prosecution themselves? Do they make referrals to the Justice Department? I actually am not aware.  I'm not. And maybe more importantly... You don't know whether they make criminal referrals to the criminal division or any other part of the Justice Department? Well, eventually, I think the U.S. attorneys from the Justice Department are involved when if a prosecution comes to court. That's my understanding. And is there any threshold or any policy or any standard for making criminal referrals? Again, Your Honor, I would not know. But more importantly... It's strange to me that you don't know because the statute that we're looking at here has to do with investigating or prosecuting. Does it have to do with investigating or prosecuting criminal? Your Honor, I wouldn't know. But more importantly, IRS would not know either. I mean, IRS's role under the statute is a very limited role. Congress has said that IRS shall disclose information upon receipt of a request that includes the specified information. And so IRS is not given discretion under the statute to question or to second guess or to conduct its own inquiry as to whether the representation... But they have to be given a specific reason or reasons why disclosure of the requested information is or may be relevant. And if that information is in the request, the statute says IRS shall disclose upon receipt of that request. So that strongly indicates that Congress didn't expect that IRS would substitute its own judgment for that of ICE in deciding what is or is not or may be relevant in a criminal investigation. The gatekeeping function under the statute is actually the requirement that any request must come from the head of the agency and it must be in writing. And that's the way that Congress ensured that pressed requests under the statute would not be made inappropriately or with impunity. But if one is in the IRS and is assessing reasons given by ICE, why the information that they're requesting from the IRS is or may be relevant to a proceeding or investigation, don't they have to have some understanding of what kind of proceeding or investigation is at issue? Your Honor, I would say... You're talking about disclosure... As I've just said, Your Honor, the... ...use in criminal investigations. Yep. So if a request designates... The request merely has to set forth information as required in the statute, which includes the specific criminal statute. And it has to include a specific reason or reasons why the information is or may be relevant to the investigation. But here, the only reason, specific reason why the disclosure is relevant is just, spoiler plate, it's potentially at issue to prove a violation of a deportation rate, USC 1253A1. And we're talking about criminal though, criminal violation. So why does ICE need it to prove that? We don't have any understanding of ICE's involvement in a criminal prosecution. So my first response is, IRS isn't the one making that call. It's the head of the agency who includes that information in the request. And once there's a complete request... Head of ICE. Head of ICE, yes. And once there's a request that has that information, IRS is obligated to disclose upon receipt. But here, the information... ...has that information. The only information... There was no specific reason or reasons why disclosure of, you know, any individual on the spreadsheet's address was relevant to a criminal investigation. It just says it's potentially relevant. I disagreed. It's completely bootstrapping and circular. I did. No information given like, we need your address information. We have some address information. We need your address information for this standard time interval from 2022 to the present because... It doesn't say because we needed to talk to people, because we have reasons to think our address is incorrect, because we plan to go arrest that person. I mean, there's just nothing explaining a specific reason or reason. Well, in addition to that, so the request came in the form of a written letter, which includes the language your honor has referenced, but also part of the request was a data request or the data file that was submitted along with the request, and the data file included also additional reason, which was to verify presence in the United States. And the excerpt of the data file is appendix page 434. So, ICE was requesting address information from IRS in order to verify presence. Let me get the page you're directing me to. Yes, this is appendix page 434. Presence or unlawful presence? It just says to verify presence in the United States of America. Is it unlawful about being present in the US if you're still going through, you don't have a final removal order? Well, all of these individuals did have a final removal order. Defined final. All the 7 million in the first. That's correct, your honor. The final is the BIA, no court of appeals today would define final. I don't know. It's not in the record. It's not defined, but what? No, it is defined in the law. And it is, it's either it's got to be signed off by BIA, time to appeal is run. And obviously, it wouldn't include 1, if the court of appeals had given a stay. So, what the memorandum of understanding says is. It's not criminal until they've overstayed 90 days. Yeah, DHS, the memorandum of understanding explains that the aliens have been illegally present in the United States whom they have represented are under final orders to remove them from the United States. But it's not, it's not a crime unless they're here 90 days after when you have to have a final order of removal. You don't know if they actually had final ones too. You don't know if they were 90 days. Or are you representing that everybody in the file? I think calculated was here more than 90 days. Yes, in fact, they were all here over 90 days. Well, those are the individuals. No, no, there were there could there may have been some in the data file request that had not overstayed yet by 90 days. But the criminal statute 1253A1 includes additional violations. The 90-day period is not the only violation. An alien can also... What other one is cited in the request that was submitted? The statute that was, the statute cited is 1253A. Which is the oversight one, right? That's included. But also an alien can violate that statute by failing to timely apply for travel documents. Or if the alien fails to present himself at the time and place that the attorney general has ordered pursuant to a final order of removal. You're representing that individualized determinations were made for all, I forget, was it 700,000? I'm representing that the purpose of this request was to verify whether individuals who are under and subject to a final order of removal... They thought travel documents isn't going to be affected by... If they were still present in the United States. And all that's needed is that the information... If they're just prosecuting the unlawful presence, then they have to have overstayed by more than 90 days. I mean, there's a whole program line where the date must be more than 90 days from the removal. I agree. And I think that's the emphasis. But you asked if there were individuals included that have not yet completed the 90 days. That's the basis for the reason they're on the list. There's individualized determinations. Are you telling me that's what it is? In the memorandum... The only thing programmed in here is, let's make sure there's a final order of removal. We don't know if it really was final. And so they've overstayed at 90 days or 91 days. All we have to go... All the IRS has to go off here are the representations made by DHS. And those representations are included in the memorandum of understanding on the first page in the introduction, where DHS has identified numerous aliens illegally present, who DHS has represented are under final orders to remove. This is A372 in the appendix. No, you have the paragraph from Todd Lyons and Ipsodix. This is in order to fulfill our role as an agency in enforcing immigration laws. It's way too high level, nothing individualized. That should have alerted somebody. Well, there's also... The program set up to say, is there a final... One of the things that Peter has to check is, is there a final order of removal? You're not even really sure they were final, but let's assume they were on that. Make sure it's more than 90 days. And we know that at the time... We know from this record that at the time these were submitted, there were folks on there who had not yet hit the 90-day mark. You know how we know? Because the record shows that, oh, we ran it again yesterday and a few more people got added to the list because they weren't at 90 days when it was sent to us by ICE. And now they are. As I said, Your Honor, there is more than one way to violate the statute. Are you representing that individualized determinations were made that add to those people that were not yet over 90 days at the time this massive file was sent? An individualized determination was made that, yes, but this one hadn't yet sought documents? This one hadn't yet appeared somewhere? All I can say is what DHS has represented, which is that those individuals... Well, that's the problem. They're under investigation under the statute. And the statute includes more than one way to violate it, which is... It's harder not to help you. The very fact that there's multiple different offenses, different ways actually to violate 1253, and therefore different facts that would be needed to establish a violation. It seems like where there's a requirement in the statute, in the taxpayer information release statute, to give an individualized determination of the need for it. The boilerplate recitation of there's a need for this to comply with this statute really doesn't seem to give us anything. My response is that a person's continued and current presence in the United States is relevant to all of those potential violations under Section 1253A1. If a person has a final order of removal and they are still present in the United States... Or if they don't have a final order of removal. Even if some of them were just approaching the 90 days, like I said... We don't know how long. We agreed. Agreed, I don't. And the record doesn't tell us. A person's continued presence, a person who ICE claims to have a reason to know is here unlawfully is still here unlawfully. That's what they're trying to tell. That's what they're trying to find out. That's what the ICE represented in their request, to verify presence in the United States. And if a person is still present, that is certainly at least relevant or probative to a potential violation under the statute. What's your theory about the point of contact in the data file? It's one person for all these 1.2 million, or I guess it was like 50,000 or something that were actually produced. The same person is identified as personally and directly engaged in the criminal proceeding or criminal investigation. What is the theory of how that one person was personally and directly engaged in these tens of thousands of people's cases? Yes, and we've set this forth in our briefing, which was that this initiative involved a large-scale investigation into potential violations by many individuals. And it began with a high-level review where this person, the Assistant Director of Enforcement and Removal Operations, would have been the person making the decisions and leading and in charge of that broad-scale investigation. There's evidence of that in the record on page 338 of the appendix. This is the initial contact when ICE reached out to IRS and explained there's an internal IRS email that says, hey, we've just been contacted by an ICE Assistant Director. Again, this is appendix page 338. We've just been contacted by an ICE Assistant Director regarding IRS assisting in an ICE-led effort to locate approximately 700,000 individuals who are all under final orders of removal. This effort is being called a lead targeting cell and is being run out of the ICE headquarters in D.C. So this gives you a feel for the large scale of this investigation, and then appropriately so, it was being led up by an Assistant Director of Enforcement and Removal Operations, Mr. Williams. They're involved in a criminal investigation at an early stage in a kind of en masse. That's right. And how is there reason to think that people who don't have an order of deportation yet, I mean, criminal involves some knowledge on the part of the defendant, right? How is there reason to know that, for example, if it's a failure to appear or a document, failure to present certain documents, that the individual has knowledge? Like, I had been really focusing on the component that is that they have an order of deportation, so you can get inferred knowledge from that because if they have the order, they know they should leave. Right. Is that your question? Yeah. The other offenses that you mentioned under 1253-A1, the other ways of violating, how do we know that people have knowledge if they haven't been given an order of deportation? So all of them were under final orders of removal. So that's the baseline. All of the individuals in the request... No, they were all. The question was, were all of them already passed the 90 days? Got it. And some of them weren't, you know, not all of them were passed, but every individual in the request was under a final order of removal. And so this was a large-scale, initial, high-level review investigation that later would have been delegated. An additional staff could have been appointed as appropriate in order to conduct individual investigations with respect to certain individuals, but it began as a high-level investigation. Can you tell me, sorry, where in the ROMO declaration it says this data exchange overview procedure has been dropped? Where it's been dropped? Was that the question? Or changed? What I, what I gleaned from the declaration is, is that IRS is admitting an error in the implementation of the policy. Yes. What action IRS has since taken to, to, to remedy the error, I can only speculate. I'm not aware of what, if any, action IRS has done to correct the remedy, but... The record that says this has been withdrawn or replaced? The data exchange overview? I'm not aware of how... Program, which is what you have to have to process, I think, mass requests. The ROMO... Right. What the ROMO declaration says is that IRS is remediating, attempting to remediate the error, reached out to DHS. Continue to work to make sure they comply with the law, which is what we were told in El Centro. Right. IRS reached out to DHS and requested that they take steps to prevent the disclosure or dissemination and to ensure appropriate disposal of the data. So IRS is working to remediate that. As far as changing the computer process, I, I could only speculate what's happened. I mean, a computer, a computer process just like this is going to have to be adopted if you're going to run these mass numbers based on these, they're just sort of computer inputs that you're getting from... Right. DHS. So as far as the record shows at this point, this is neither withdrawn, changed, or replaced. Well, I think IRS recognizes that, that it's problematic and, and would not, I, I would imagine would, given the error...  I think I can fairly say that IRS would not be using the same computer system in the future. Well, they've had plenty of time. They've had plenty of time. Well, they're not enjoined. They're enjoined from processing ICE requests. They're not enjoined from fixing their own internal errors, are they? Again, Your Honor, I don't, I don't know... Is injunction anywhere from this or the one from the other court that prevents you from fixing your computer program so that if in one, the injunctions lift? Your Honor, I'm not aware of what action IRS has taken in that regard. More questions? This one? Sorry. All right. Thank you. Thank you very much for all your extra time. Thank you. Good morning, Your Honors, and may it please the court. My name is Madeline Jitomer on behalf of the plaintiff's affiliates. Before we get into more nitty gritty, counsel for the government has said they have no objection to this court supplementing the record on appeal with the Romo declaration under FRAP 10E2. Yes, Your Honor. Do you agree, object, have a view on that? We have no objection and believe it should be added to the record.  Sorry for the initial interruption. Not at all. This court has repeatedly held that a policy need not be written in a formal statement to be agency action, and the district court committed no clear error in finding one that exists here. As Your Honor mentioned, this record is replete with evidence showing that the IRS has changed the way it evaluated requests under 6103. As this court mentioned, A462 is one piece of evidence that demonstrates that. In addition, the internal revenue manual was changed shortly after the MOU was entered into to reflect a change in policy. The district court made a factual finding that there is uncontested record evidence that the IRS spent money developing the technical capability to conduct match transfers, actually made those transfers, and that any IRS official that stood in the way of implementation of that policy was pushed out. The difficulty I have, Mr. Jona, with that analysis is that this was a major request for whatever $1.2 million or, you know, piece of information. One would do some software building and do some to respond to that request. So I'm not sure that creating new programming and new method means that it outlives the response to that request. And that seems to be because you're here seeking future regarding relief, injunction, declaratory relief. And so the question is, is this legal analysis that was done for this request have an afterlife? What's the best evidence of that? I would put the court to A-440. This is an email that-where IRS acting counsel evaluated this request for one point-this request, which is actually 1.2 million requests. I think that the new policy has two parts. The first part is that the IRS has shifted from individual review of each request to make sure that that individual request meets the requirements set forth in I-2 to an evaluation of that request at the 1.2 million person level. So does that request include a data field? Does the letter and does the spreadsheet that Mr. Christensen mentioned have a field for addresses? Does it have a field for the relevant tax return years? If that's met, then the process moves to computer processing. That is contrasted by the process that was laid out in the manual pre-April 2025, where each individual request or each handful of requests, maybe five, were assigned to a disclosure manager. That individual at the IRS was required to ensure that the requirements in I-2 were met, communicate with the requesting AUSA to determine the specific reasons for which it would be used, and then submit a memo to determine whether that request should be effectuated. MARY JO GIOVACCHINI Again, right. We know that they did something different. They got a size of request that was dramatically different. They dealt with it in a very different way. All-if we accept all that, we still have the question, are they continuing to process? You know, they didn't, they gave a pretty moderate response rate to what was sought. Do we have any reason to believe that the service is continuing to process the request with regard to the balance of that $1.2 million over, what was it, the $700,000 that they did deal with? But there's any continued use with respect to this request? MARY JO GIOVACCHINI I would say two things, John. First, there is no evidence that they are not interested in continuing to process this or similar requests. And we know that because the Walker Declaration in the record says that it has, it finished at that time but had not, but makes no commitments as to future processing. And I think that's also evidenced by what Judge Millett said, which is that the IRS continued processing because it noted that more individuals were then pulled into the response because 90 days has expired. The IRS has made no representations at any point in the record that they are done continuing, done processing this request or any others. And I think there is significant record evidence, to your point, that they have changed the way they process information under I-2. I think that is sufficient. MARY JO GIOVACCHINI But what we don't know is, is it a bespoke change? You know, we get this unprecedented effort on the part of ICE to enrich its database. It's going to go and, you know, scrape what it can all around the government. And this is what they got from the IRS. We don't know whether this is an ongoing system or whether it's just like, you know, we're going to throw the spaghetti at the wall, see what we get, and move on. And you're right. They haven't foreclosed the notion that they could continue to abide by this legal advice. They could continue to do things according to the template that they effectively developed here. But we don't really have something affirmative saying that they will. And that's, or do we? MARY JO GIOVACCHINI I think the record taken as a whole shows that they didn't just throw spaghetti at the wall once. They've thrown it many times. And the IRS has worked hand-in-hand with ICE to ensure that it could process its requests under this new process. So I think the district court found that this technical capability was not built solely for this in response to this request. It was built in response to an effort which it calls in the record at A-473, an on-demand process to provide address information to ICE. There's nothing in the record that shows that that's directly responsive to this request. Instead, this tracks back to February and then when the MOU was entered in April, an effort by the IRS and ICE to create a new process under I-2 to evaluate requests so that address information could be disclosed to the, to ICE. MARY JO GIOVACCHINI I think J-473 through 77, whole table of contents, ICE exchange overview, architecture overview, internal output, and then discussion points include volume and frequency of the data we are expecting. They're expecting this to keep coming. JILL LEPORE That's correct, Your Honor. MARY JO GIOVACCHINI This is not a one-off, one-off create this very complicated architecture, computer architecture, programming architecture, I guess is what it is. JILL LEPORE I think that's... One thing to discuss now that we've got that in place, the volume and frequency of the data we are expecting. MARY JO GIOVACCHINI I think that's exactly right. I'd like to make two other points, Your Honor, to add to your point there. The first is that I don't believe the changes to the internal revenue manual would have been made in April in anticipation of one unknown mass request that came in June. I think there was, again, those, this mass request could not have been processed under the IRS's previous policy for how it was going to evaluate requests under I-2. JOE DUNLAP What in the manual substantively was changed? MARY JO GIOVACCHINI There are two provisions in the manual that were changed. There was a process by which I-2 requests were evaluated, and then there was a checklist for processing requests under I-2. The checklist itself was just removed. That checklist included steps like the assignment of an IRS disclosure manager to each request, and a requirement that that disclosure manager discuss that request with the requesting officer. In the manual, it stated AUSA because that was typically who was requesting the information. In addition, it laid out a process by which that manager then sought approval through, for example, submission of a memo to determine whether that, the requirements of I-2 were met. I do want to address Mr. Christensen's point that the IRS needs to take at face value the information it receives. I don't think that's what 6103 requires. This court has said that section 6103 of the Internal Revenue Code requires, regulates minutely the disclosures of tax information under 6103. And so the idea that the IRS must look at the headers in a spreadsheet and determine that if those headers include the required information in I-2, all of that data can be disclosed, I think that misreads the IRS's obligation to enforce its own statute. Can I say more about what, go ahead. Can I just get your response to the government's arguments? And I have some concerns myself about standing in irreparable harm. Absolutely, Your Honor. I'd like to start with the Center for Taxpayer Rights. The address sharing policy harms the center because it impacts its core activities. These are its legal representation of clients, pro bono representation of clients, and its education and outreach. And the center has used its resources to counteract those harms. The district court made a factual finding that there's been a dramatic decline in the center's ability to provide its services. So, for example, in 2024, the, well, I should note that the center is required by statute to serve immigrant communities. And the statute refers, uses as a proxy for immigrant communities, ESL taxpayers, that's English as a second language, and ITIN taxpayers, that's individual tax identification number. And so the statute requires that any low-income tax clinic serve those taxpayers. In 2024, and in your... I'm sorry, an individual taxpayer number is a taxpayer number for someone who doesn't have a social security number? That's correct. And in many cases, those are immigrants. In 2024, the center served 14 ITIN, I'm sorry, the center represented 14 ITIN clients in disputes against the IRS, 16 ESL taxpayers, that's collectively including the 14 in front of the IRS. In 2025, that number dropped to one. In 2024, the center held 10 events focused on the rights and responsibilities of ESL taxpayers. In 2025, they were only able to hold one. This, so this is not a case where the center spent its way into standing. This is not a... My understanding is that the district court only evaluated standing with respect to the center and not with respect to any of the other plaintiffs. Do I have that wrong? The district court did also address associational standing. Associational standing with respect to the center. My understanding is that the district court determined that there was a substantial likelihood that the plaintiffs as a whole on behalf of their members, so the Main Street Alliance, who indicated that they have members that file with ITIN numbers, that there was a substantial likelihood that they would be able to show standing on behalf of their members. I mean, I read the footnote in the district court's opinion to acknowledge that the center doesn't have members, but that the district court was kind of proceeding kind of almost as if it really was a membership organization anyway. I read that footnote to say that the district court was not reaching the question of whether the center has members. What I will say is that the center does run an LITC network. That's a network of other clinics that it serves. At the district court level, the center did argue or did present third-party and associational standing claims, but the district court did not rule on them. But I think that's not dispositive here. I think that it's very clear that the center has organizational standing because its core business activities are not ones that are related to its opposition to this policy or advocacy against this policy. These are activities that it has been conducting for a long standing period of time and are in accordance with its mission and its statutory obligation. So even if we accept all that, how is any of this irreparable harm? So I think the center's irreparable harm is certain and great because it's not imminent. It's not about to occur. It has already begun occurring. We know because the center's clients have told the center that they are unable to engage with the tax system. They are fearful. It has chilled their engagement with the tax system. And that's irreparable in a few ways. So first, as this court said in Alpine Security Corporation, where a business is destroyed in its current form, that commonly qualifies as irreparable harm. Here we have an organization that is unable to provide its core services because of the impact of a policy on its clients. That's very similar to what the Supreme Court found in Department of Commerce versus New York, where the court found that inclusion of a census question was an obvious cause of a chilling effect on individuals that affected states, right? So even where the Census Bureau was required to protect that information, the court found that third parties reacting in predictable ways, or as the court said in Dominion Alternative Energy, in common sense and predictable ways, that is enough to infer causation where there's not direct regulation of the organization itself. And so to go back to your question on irreparable harm, I think there's—the district court, I think, found four types of irreparable harm. First, that the trust engendered between the Center for Taxpayer Rights and its clients is difficult to measure, but more importantly, difficult to replace. So where the clients have for years trusted the center and where the center advises them on the protections that exist in the tax system and encourage them to participate in the tax system, right? And they've identified that the tax system is the lifeblood of our government. So where they have encouraged participation in that tax system, and then an unlawful act harms that trust in ways that can injure that individual, that's an irreparable harm to the center because it erodes the trust between the center and its clients. Like I mentioned, similar to in Alpine, it threatens the existence of the pro bono legal services program and their education and outreach program with respect to ESL taxpayers. It also threatens federal funding. So another basis on which the district court found standing and irreparable harm was because it found there was a substantial likelihood that the center could lose its federal funding with respect to its low-income tax center. Now, that's not—that funding is contingent on the center meeting its goals and showing substantial progress towards meeting its goals. Those goals are not ambiguous. Each year, the center needs to report to the IRS very specific metrics with respect to engagement with this set of taxpayers. So, for example, every year they need to report to the IRS the number of consultations they have with ESL taxpayers, the number of disputes in which they've represented clients in front of—in front of the IRS with respect to ESL taxpayers. There's a list of almost a dozen metrics with respect to ESL and ITIN taxpayers. And in every one but one of those metrics, the center is down compared to last year. And so as opposed to being able to show progress, it is showing that it is harmed and it is actually reversing its progress as a result of this policy. And again, we know that this policy is the cause because that is what the center has—that is what the clients of the center have told the center. And we know that's at A-186 and A-317 in both of Ms. Olson's declarations. We also—the only—I'm sorry, Judge. The last point I would make is that the district court made a factual finding crediting the public reporting—the significant public reporting on the policy and crediting the fact that immigrant taxpayers know about the policy and are chilled because of it. Thank you. So we have a case called Legal Women Voters and Immigration Newbie, in which we found standing where the lead—for the lead, which was—its mission was to register voters. And the new requirements for citizenship documentation were driving down the number of people it could reach out to, people it could get to register, just driving people away from their registration events. Is that the theory you have here, sort of driving away the client base? Yes, Your Honor. That is—this case is on all fours with Newbie. I appreciate you raising it because it also reminds me of the fourth type of irreparable harm we have here, which I failed to mention, which is that in Newbie, the court said there was irreparable harm because there was an upcoming election, right? The harm that with respect to that election could not be undone after the election had  And like that, here the IRS has deadlines in place. So we have clients who are walking away—I'm sorry, the center has clients who are walking away from tax credit and refunds to which they are entitled. And there are deadlines by which they must apply or to engage in a dispute. There are statutes of limitations and deadlines by which they must engage with the IRS. As time goes on, those deadlines pass, and they cannot be made whole. In addition, for these taxpayers, I want to make two points. The IRS says repeatedly that everyone is required to pay taxes, and so this is not a voluntary tax system. But this court and others have reminded us time and time again that this is a voluntary system. Congress intended for 6103 to place stringent protections on this data because the voluntary participation in our tax system depends on it. And that's important here because the harm to not receiving a $500 credit is irreparable, for example, to someone who makes under $15,000 a year and thus is not required on an annual basis to file taxes. If they are below the refund limit that the IRS sets each year, there is no requirement that they file taxes. But it's important to our voluntary taxpaying system that they do participate. And in fact, the district court made factual findings here that this year alone the policy would result in almost in nearly $12 billion of revenue loss as a result of the policy. So I don't have one standing. Go ahead. So on the policy, you've heard your friend on the other side say there really isn't a policy other than the MOU and that your complaint doesn't challenge this specific disclosure. So it's checkmate because we held in Centro that the MOU was not a final agency action. And to the extent that a decision made by an official to make a disclosure could be a final agency action, you're not challenging any specific decision made by an official. So what's your response to that? I think that I have a few responses. This court has found that an agency cannot evade judicial review just because it has not written a policy down in one place. And here we have there is this policy is written all over the record. This is not an instance where in April there was an MOU entered into and then in late June the IRS received a request and decided how to respond to it. The record shows that there is a concerted effort of development and then implementation of a policy, which includes A462, that built the capability to process these types of requests and then implemented that process with respect to not just this request but others. The other requests never got to the second step, which is computerized processing. But as in Hispanic Affairs Project, where there are repeated practices, so where IRS counsel, for example, was pushed out because it said that the same 1.4 million requests that was approved at a high level by IRS counsel, at A430, the IRS counsel at that time, chief counsel, declined to move that request to the computerized process stage because it said that same request didn't meet. So, there was a clear effort here to create a policy, a new process by which this information would be disclosed. I think the numbers also speak for themselves. So, in our district court briefing at A96, we talk about how the IRS is required to disclose to the Joint Committee on Taxation the number of disclosures it makes under I-2 per year and to what agency. From 2018 to 2024, there were zero disclosures made under I-2 to DHS or ICE. Just two weeks ago, they submitted the report for 2025, and that report showed that from—that 47 disclosures to DHS and ICE. That is more than half of the total disclosures last year from the IRS to ICE, and it's more than the total number of disclosures for almost every year from 2018 to 2024. MARY JO GIOVACCHINI What do you make of that 47 disclosures number? There's either, you know, tens of thousands or one? What are they referring to? Are they identified? I'm sorry, the 47—the 47,000 number? MARY JO GIOVACCHINI Oh, yeah. I apologize. I thought you said 47 disclosures. I apologize if I— They said 47. It was the exact number in—that is, that our issue here. Of lines in the spreadsheet that you're responding to. That's correct. One thing—sorry. If Your Honors don't have any other questions on that, I would like to quickly—yes, Your Honor. I just—I mean, still on this question about policy, you point to changes to the manual, but as I understand it, the manual is not binding, and there's case also holding. You refer to this—these sort of discussion points and draft workflow chart at A76, A77, you know, volume and frequency of the data we are expecting. This is by, I guess, the tech people presented as a draft, as discussion points. I take it you're not saying this is the policy? You're saying this is evidence of an unwritten policy? And this—and the manual? MARY JO GIOVACCHINI I think that's correct, Your Honor. I think that there is significant evidence in the record, but I would point to three places in the record that I think are most reflective of the policy. It is the Internal Revenue Manual. Those citations are discussed at A91 in our briefing. It is the data—the DHS ICE Data Exchange Overview at 462, and it's emailed like that at A440. Those represent a meaningful change in how the IRS process requests under I-2. I think the policy has two core features. First, it allows for disclosures under I-2 without any individual evaluation of whether each individual request meets the requirements set forth in I-2. And second, it abdicates the IRS's role in keeping tax information confidential as it is required to do by 6103. 6103 sets forth a general rule that tax information shall be kept confidential unless it meets all of the requirements, in this case, set forth in Exception I-2. And in this case, the policy shift that is critical here is that the IRS no longer required that each individual request be evaluated to ensure that it fit each of the requirements set forth in that exception. I think that's what's notable here. MARY JO GIOVACCHINI. They're saying each individual request is being examined by algorithm.  And, Your Honor, that—I'd make two points. One, that algorithm is insufficient here. So, for example, if an individual was—if an individual was reviewing individually, let's say—let's not do 1.2 million, let's say the 47,000, each of those requests, it would understand that 00000 is not an address. And so, I would say, first, the computerized rules are insufficient here. And second, the rules—so, yeah, I mean, I think I would say the computerized rules are insufficient for two reasons. One, they don't actually require that each of the I-2 requirements are met. And second, they don't involve the IRS in assessing each request. The IRS must do more than what Mr. Christensen contends. They must do more than rubber stamp these requests, particularly where these requests on their face are clearly beyond credibility. So, for example, I think the address example is the most straightforward. No one here thinks that the policy requires an actual address to be submitted for each taxpayer. As Mr. Christensen—  That this process that they used for the August submission—August disclosures.  Oh, did the process that they developed for ICE requests under the MOU. The statute requires that.  An actual address. Correct. You know, I'm saying the IRS's judgment isn't being brought to bear. That is part of it, yes. The IRS must do more than just rubber stamp. So, for example, I'd also point the court towards the taxable periods of the return information. This is why the individual nature of this matters. For an individual who has a removal order from the end of 2024, an address from 2022 is going to do nothing to show that that individual has overstayed their removal order. But what the IRS has done here is said, well, collectively, for 1.2 million people, this range is sufficient. I'll add to that that the output that ICE is receiving—so, the output of what the IRS is sending—does not attach a date or even a year to the address. So, when ICE receives this information, they only know that this is the IRS's last known address. It provides no evidence as to when that address is from. It may be from 2022, two years before a removal order is even entered. It may be from 2025. But the ICE does not know. And so, where a request is— So, if an IRS doesn't attach dates to its address. That's correct. And— I don't understand that argument to have too much force. I mean, assuming that they are making a request for whatever information that the IRS has for somebody in its 90 days past a final removal order, whether the address is—was given to the IRS last week or 10 years ago, it still could be relevant to an investigation of them going to that address and seeing if that person is still in the United States when they're supposed to be gone. So, I would make two points in response to that, Your Honor. And first, Judge Pillard, I would just point you to A464 for the point I made before about what information is sent from the IRS to ICE, which does not include any year. But to your point, Your Honor, if the rationale for which they are giving this information is so that they can go out and locate the person, right, if that's the specific reason, it is then beyond credibility that one individual could do that, not only for the 1.2 million individuals in this request, but the 7.5 where that individual was also listed as personally and directly engaged. So, they could be engaged in the investigation and task that, you know, to groups of people. We have all these addresses in, you know, Iowa City. We're going to have paralegals in the U.S. Attorney's Office there go off and do it. I mean, you can be personally, whatever it is, and directly involved without the only person who's personally and directly involved. I think that's a difficulty with that. And, you know, and I think if you're, I mean, if this were a murder investigation, even if it's a stale address, you'd go there and find out, you know, have you ever heard of this person? What do we know? I mean, it is a little extraordinary that there's going to be follow-up on all of these folks. It's a little unclear, I get that. But the relevance doesn't have to be that it's going to be more recent. I would make two points, Your Honor. First, I think you're right that there may be follow-up on all of these people. Because what the White House spokesperson said is that this policy is part of the administration's goal to locate and deport these individuals. But what 6103 permits is disclosures for criminal investigations only. And that goes to my second point, which is that the IRS in its brief conceded that it does not have open criminal investigations for each of these individuals. They said that they are running an investigation, I would call it more a dragnet or surveillance, of vast amounts of what this government calls its most confidential data, to then determine, after the receipt and surveillance of that data, whether it wants to open individual investigations. Those are the investigations that I think this statute requires. Because this information, as this court said in Centro, 6103 does not authorize the freewheeling disclosure of sensitive contact information. I take your point, but if the government in its wisdom decides that rather than finding people who have overstayed the 90 days and have a final removal order, rather than use resources to prosecute them and put them in jails or whatever here in the U.S., it's just going to go ahead and remove them. How is that kind of abusing this statute? Because it's still a crime that they're investigating, but maybe they've made a decision that maybe they can announce to the world, we're not actually going to prosecute anyone who may have committed this crime. We just want to go ahead and effectuate their removal from the United States. How does that violate the statute? I think that betrays Congress's intent in 6103, in creating a statute that protects what it calls some of this country's most sensitive data. Congress said in passing 6103 that the privacy of that data should be equivalent to an individual's papers within their own home. So if there was a legitimate prosecution that could be had, that they could be using it to but they've said, look, we have a policy where we're just not going to prosecute any of these people. We just want to remove them because they do have a final removal order. You're saying if that were announced and it's absolutely crystal clear that that were final agency action, it's written down, it's rulemaking, it could be whatever the whistles are, that we should strike that down because that would be contrary to law. Here's what I would say, your honor. If ICE requested one address for about one individual, they conducted or were conducting a criminal investigation. I want you to answer my question, which is what I described, would that be contrary to law? With apologies, your honor, could you repeat the hypothetical? There's undisputable final agency action that we are going to make these requests. Let's just say they're going to be one-by-one requests. It's for persons that we know have a final removal order and it's more than 90 days, but we want to find addresses. And yes, we could prosecute those people if we found them for overstaying it, but we don't intend to do that. We just want to investigate whether they're here and if they're here, remove them. I understand, your honor. Would that be contrary to law? That would be contrary to law because what the statute requires is that ICE provide the specific reason why it is relevant to a criminal investigation. And what you just stated is that the investigation is not criminal in nature. There may be a pending criminal matter with respect to that individual or group of individuals, but what you just stated, your honor, is that- So if they say that rather than prosecute the person, we're going to enter into, you know, some sort of deferred offer, some sort of deferred prosecution agreement to them to where rather than prosecuting, rather than going forward with a prosecution, they essentially kind of get a deal where rather than a conviction and potentially a prison sentence, they can leave. Does that violate the- Is that contrary to law? I think that is a closer call, but I don't think that's what that issue here. I would go back to Judge Pillars' question to Mr. Christensen earlier, which is, is DOJ involved and what typically is their involvement? To the extent that there are those agreements in place, I think there's a high likelihood that DOJ would be involved. Where the requests for 1.24 million addresses are on their case, clearly not pursuant to criminal investigations. I think that's a different question. I guess what I'm trying to get an answer to you from is like why does one have to read the statute to say that there has to be, as it says, I'm looking at the language, the person has to, it talks about an investigation which may result in such a proceeding, but I guess what language in the statute would you say that these hypothetical policies I'm beating about the head and shoulders with, what language in the statute would you say it's violent? MARY JO GIOVACCHINI I would say that in I-2-B-4, the IRS must receive the specific reason why such disclosure is or may be relevant to such investigation. The word investigation then refers back to I-1, where investigation refers to a criminal investigation. So this country's promise has always been, and President Trump in his first term said, that this information will not be used for civil immigration enforcement. And what the record shows collectively is that ICE is working with the IRS to try to cram a significant amount of address disclosures into I-2 unlawfully. So is it, and maybe this is oversimplified, but it seems like if you're ICE and you have issued an order of deportation for whoever, you know, the person has an order of deportation, you know the date of that order, and you know that 90 or more days has passed, you already know that the crime has been completed. There's no further investigation for that crime. So what they're using the information for is not for a criminal investigation. They're using it to round people up and deport them. That's correct, Your Honor. And I think the district court made significant factual findings with respect to the substantial likelihood that ICE is or will be using this information in order to conduct civil immigration enforcement. There's also information in the record where ICE says that it wants this data to enrich its own records. And I guess the question is, I'm just answering being devil's advocate on my own question, which is, okay, the crime of overstay is complete without the address information, but maybe not if they don't know whether the person is still in the United States. But then wouldn't they have to call the data they have and say, you know, we've checked whether these people are still here, here's the unknowns, or? I mean, none of that is, that is one element of the crime, that there's no evidence has been investigated. I think in addition, I believe it's about two-thirds of removal orders are delivered in absentia. And so willful overstay is the criminal term. And there's nothing to suggest that they're doing anything to investigate that. And again, I just want to go back to the prior policy. That could all be discussed between the IRS's disclosure manager and the AUSA or immigration official investigating a crime to ensure that the statutory requirements are being met. But that process has been eroded here, and it's replaced by insufficient computerized rules. Do you have any information, and I'll try to remember to ask this of Mr. Christianson, any information of how often an overstay is criminally prosecuted? Candidly, Your Honor, I did try to obtain that information and was unable to find it. But, yes, I don't have that information. Our belief is that it is a low number. And for example, there were not 47,000 prosecutions with respect to this last year. Right. I guess what I'm, is it sort of becoming clear to me, is there has to be some nexus to a criminal investigation of the information that they're seeking? And the question is, what is that? I agree with that. Your Honor. More questions? I just have one more question, I think, on 444, Appendix 444. Yes, Your Honor. This is Gregory, I guess, slash IRS. We understand that this letter, and that's the one from Todd Lyons with the spreadsheet of information. We understand that this letter, coupled with the data file, comply with the requirements of the MOU and statute. And so IRS should begin processing. Sorry, there's so many emails and stuff in here. Where is the decision made that we understand that this letter complies? Do we know who made that decision that it complies? Yes. So, if I may, for one moment, just walk through the steps because it is hard to parse. So, on June 25th, the spreadsheet that Mr. Christensen referenced was sent to the IRS. On June 25th at A430, at that point, Chief Counsel, I'll use his initials, AD, determined that that spreadsheet did not meet the requirements. On June, by June 27th, he was pushed out of the IRS. On June 27th at A440, there's an email from AM, the Deputy Chief Counsel, to IT. By June, which? I'm sorry, it's on July 1st. I apologize. July 1st, A? 440. So, this Tyler email to cash it in, personally identify it. It's from Morris on A440. That's what I have. Audrey Morris? Oh, sorry. And in the email below that, a Treasury official says, IT says, I was told not to process this information until AD has signed off. And Treasury says, don't wait for that. Go to AM, which is Deputy Chief Counsel. This email is the one that says, this has met the requirements, and the IRS can begin processing the request. That request is the spreadsheet, and then on June 27th, the IRS sent a letter, which is at A449. So, the request is the spreadsheet, which is partially redacted, coupled with the letter at A449. And I do want to just emphasize, I'm calling it a request, but we do need to be clear. It is 1.2 million requests rolled into one approval. And I think that is, you know, a clear evidence of the change in policy here. Okay, and then 445, you have the Chief Information Officer saying, we met with, or SAC Council met with, repeating the Audrey Morris, met with the 6103 experts, and we're going to run it through our data exchange program. That's correct, Your Honor. So, why is ICE not made a party to this proceed? This case is about the IRS's treatment and protection of its data. And so, at the time this case was brought, that is where this case focused, and our clients wanted to focus. The Center for Taxpayer Rights' entire mission and statutory obligations are focused on the IRS's protection of data. And so, regardless of what ICE has done, for example, if ICE wanted to send requests en masse, I don't think our clients would have objection to that if they were processed consistent with IRS policy. ICE can do what it wants, just like any other agency can with respect to requests under 6103. But the obligation to protect tax data is that of the IRS, and that is why our clients have focused on the actions of the agency. And is it accurate for us to view your allegation of what is the final agency action as not the specific disclosure that was made in, was it June, whenever it was made, August of 2025? That's correct. The policy at issue is a policy that is written but scattered around the administrative record that allows for disclosures of confidential tax information to ICE under 6103 I-2 by evaluating requests en masse and never assessing that each individual request meets I-2 statutory requirements. So if it was en masse and the algorithm was fantastic and it required really detailed narrative descriptions and every one of them had to be different and had to really match the data, that would be a problem? I think that really depends on the facts. For example, if the algorithm had a way to confirm that as this court said in central, like not any address will do, but confirm that it is an address to whom the information relates of the taxpayer, if they could confirm that the reason for which the information was disclosed is specific enough, I don't think that would necessarily violate the contrary to law claims. I do think it would still be arbitrary and capricious because there would be a meaningful change in which the agency processed these requests and interpreted I-2 without explanation, without considering reliance interests, but I think that's very different than what we see here. Well, would it be? If I had more confidence generally in the ability of an algorithm to do a great job, this one just was pretty blunt and careless, how would I analyze your claim? The policy is they used an algorithm that was inadequate to confirm addresses, that didn't purport to require a reason that was specific to the circumstances of the case. Anything else? I think the IRS would have, I do think the IRS would have to do more. The 6103 regulates in minute detail disclosures and must keep information confidential, and so I think it requires, perhaps for example, your honor, apologies, an algorithm could put out an output of 47,000 addresses and then an individual disclosure manager reviews the requests and the disclosures to confirm that it meets the statute. We know that didn't happen here. They could do the first cut and that would help the processing. It would depend on the fact, but maybe, but we know here that the quality check that the IRS purports to do was I think 200 records of 1.2 million. I mean, what we're talking about is just a lack of IRS responsibility and involvement in ensuring that the statutory requirements are met, and that is a clear change in both its interpretation of what the statute requires and its policy with respect to these specific requests. No further questions? I've got you up a little over your time. Thank you very much. Thank you, your honor. We ask you to affirm. Mr. Christensen, we'll get, Mr. Christensen, if I said that correctly, I apologize. I'll give you three minutes. I think it's important to keep in mind what is the alleged policy that the district court actually found, and that's on page 1868 of the appendix. The district court found that the IRS has made a final decision to adopt and implement a policy of disclosing the confidential address information of tens of thousands of taxpayers to ICE under section 6103 of the code in reliance on representations from ICE that the address is irrelevant to and will be used for immigration-related criminal investigations and proceedings, even when ICE identifies only a single ICE employee or a small number of ICE employees as the employees personally and directly engaged in each of the tens of thousands of relevant criminal investigations or proceedings. That's the policy as the district court found it, and frankly, it's simply a gloss on the policy that's actually reflected in the memorandum of understanding. All of the evidence in the record about an address-sharing policy is simply evidence of the address-sharing policy reflected in the memorandum of understanding. Whether IRS processes these requests en masse or in bulk really is the sort of day-to-day operation that courts don't get involved in and that are not reviewable under the APA. It's the common management of government programs that courts just don't get involved in, and ICE doesn't have discretion to deny a request simply because it's made in bulk. IRS, you mean? Thank you so much. That is what I meant. I think if you had the computer algorithm that could, in fact, make sure every jot and tittle of 6103I2 was satisfied, the fact that it could do it for a thousand, I mean, the statute itself, it seems to anticipate individualized considerations, but it was written a long time ago. Not that long. It was written at a previous time before it was computerization, and there's nothing in here that insists that it has to be done one at a time as long as Congress's requirements are satisfied. Yes, I agree, Your Honor. Also, if I may, just quickly with respect to standing, the center and organizational standing, the center argues and the district court found that taxpayers were less willing to gauge in its services, and those taxpayers included two specific groups, taxpayers with individual taxpayer identification numbers and taxpayers for whom English was a second language. And domestic violence victims. And that's in the statute, correct? I don't think the district court made that finding. Oh, it was in the record here. Okay. I don't recall for sure. The point I wanted to make is that those groups of taxpayers simply are not a proxy for the individuals implicated here under the IRS's address sharing policy, which implicates individuals who have overstayed a final removal order. The district court didn't make any finding that the center's services provided to individuals who have overstayed a final removal order have decreased. No, no, but the point is a chill point. It's a point that, as never before, I mean, in most countries, I think you wouldn't go to one government bureaucracy and think you could trust it not to share information with another, but we have a very strong tradition with respect to the confidentiality of taxpayer information. So I think they're thinking, whoa, we thought there was kind of a wall here, but this is showing there isn't. Who knows what they're going to come after me about? I guess with respect, then, if that's the case, if it's the chilling effect, then, again, that's a speculative chain of causation. I don't think so, given Department of Commerce. I think the notion that people who are absolutely lawfully taken in the census, if they start upping the requirements, people are going to be deterred. The other point that I would make is you would expect or, you know, the predictable effect of the policy wouldn't be that taxpayers would be less inclined to seek services that are free, that are provided by the center. In fact, you would expect that the opposite would occur, that these immigrant taxpayers would actually be more interested and more inclined to seek out the center's services, which are provided for free, and where the center is dedicated to informing these taxpayers. I can't have anything to do with the IRS. Why would I bother to go find out information? I already know this is a bad deal. I mean, it's crazy policy, you have to admit. But that would be an irrational taxpayer to say, you know, I'm not going to file tax returns. I'm not going to do that. So, I think that it's a stretch or speculative to say that the address sharing policy caused these taxpayers to be less willing to engage the center's services. And finally, just to point out that under the Supreme Court's decision in alliance, in order to establish standing under havens, there must, that the challenge to action must, in the Supreme Court's words, must directly affect and interfere with the centers or the communities. And here, under their own theory of injury, it's a remote theory of injury based on indirect causation, which if this court were to adopt that theory of injury, it would certainly be an expansion or it would be extending the havens holding, which alliance tells us courts should not be doing. Understood. Thanks. Thank you, Your Honor. Thank you very much to both for all your assistance with this case. It is now submitted.
judges: Millett; Pillard; Wilkins